UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JOHN GLADSKY, doing business as
Gladsky Marine,

                          Plaintiff,          MEMORANDUM OPINION
                                      and ORDER

                -against-                           CV 06-3134 (ETB)

BRIAN SESSA,
                          Defendant.
------------------------------------------------------------------------X

Facts

In December 2004, plaintiff and defendant entered into an oral agreement by which plaintiff agreed to store defendant's vessel, the S/Y CLARITY, in plaintiff's marina in exchange for an agreed upon fee of $1,000 per month.[1] (First Am. Compl., ¶¶ 3-4.) Defendant paid this monthly fee from the inception of storage, December 2004, until September 2005, when he ceased making payments.[2] (Id., ¶ 5.)

On May 18, 2006, plaintiff filed a petition in the District Court for the County of Nassau seeking to recover the unpaid storage fees for the S/Y CLARITY, stemming from defendant's failure to pay the monthly storage fee after September 2005, as well as an order directing defendant to remove his vessel from plaintiff's marine yard. (Decl. of Owen F. Duffy, dated Mar. 14, 2007 ("Duffy Decl."), ¶ 22 and Ex. 1, annexed thereto.) On June 23, 2006, defendant

---

[1] This fee was subsequently reduced to $750 per month. (First Am. Compl., ¶ 4.)

[2] Defendant's attorney's declaration in support of defendant's motion for a preliminary injunction details several responsibilities that plaintiff allegedly agreed to undertake as part of the oral maritime contract and failed to follow through on. (Decl. of Owen F. Duffy, dated Mar. 14, 2007, ¶¶ 11, 14-19.)

-1-

removed the action to this court, asserting that since the dispute pertains to a maritime contract, the federal court has exclusive jurisdiction. (Id., ¶ 23 and Ex. 2.) Defendant filed an Answer on June 29, 2006 and asserted counter-claims for breach of the maritime contract by plaintiff and breach of workmanlike performance. (Id., ¶ 24 and Ex. 3.) A settlement conference was held before the undersigned on December 11, 2006, but was ultimately unsuccessful.

Defendant attempted to enter plaintiff's marina on several occasions between Christmas 2006 and New Year's Day 2007, presumably for the purpose of gaining access to his vessel. (Id., ¶ 31.) Defendant was denied access to the marina and was informed that it was closed for the holidays. (Id., ¶ 32.) Plaintiff allegedly continued to deny defendant access to the marina, and his vessel, throughout January 2007. (Id., ¶ 33.)

On February 14, 2007, defendant requested clarification from plaintiff as to whether defendant was permitted to enter the marina to work on his vessel. (Id., ¶ 34 and Ex. 9.) According to defendant, a copy of defendant's insurance certificate, listing plaintiff's marina as co-insured, was provided to plaintiff at this time. (Id., ¶ 35 and Ex. 10.) Plaintiff responded to defendant's request for clarification by an email from his attorney, Lars Forsberg, stating as follows: "The Gladsky facility is closed to those who do not provide proper/adequate insurance. In Mr. Sessa's case there is also the outstanding issue of unpaid rent." (Id., ¶ 36 and Ex. 11.) Defendant again asked plaintiff to clarify his position as to defendant's access to the marine yard and was told that he was "not permitted to enter the Gladsky facility." (Id., ¶¶ 37-38 and Ex. 12.) Plaintiff asserts that despite repeated demands, defendant has not provided plaintiff with proof of adequate liability insurance. (Aff. of Lars Forberg ("Forsberg Aff."), dated Apr. 27, 2007, ¶ 11.)

On March 14, 2007, defendant filed a motion seeking the following: (1) a preliminary injunction to allow him to enter the plaintiff's marina and gain access to, and work on, his vessel; and (2) to amend his counter-claim, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to add a claim for wrongful eviction and to seek damages for that claim. Plaintiff filed his opposition to defendant's motion on April 27, 2007. Defendant's motion was referred by Judge Bianco on May 3, 2007 and a preliminary injunction hearing was scheduled for May 11, 2007. By request of the parties, the preliminary injunction hearing was adjourned <u>sine die</u> to allow the parties to attempt to resolve the matter. On May 15, 2007, the parties consented to magistrate judge jurisdiction. <u>See</u> 28 U.S.C. §636(c). By order dated July 12, 2007, after the parties reported that they were unable to settle this action, the preliminary injunction hearing was rescheduled for July 23, 2007.

Evidentiary Hearing

At the hearing the defendant, Brian Sessa ("Sessa"), testified that Futures Marine, LLC purchased the S/Y "CLARITY" in June 2004. Sessa is the sole owner of the corporation. (Tr. 3.)[3] The 80' sailing yacht was purchased in France and brought to the United States with the intent to convert the vessel from a flat-out race boat to a luxury sailing yacht for charter in the Caribbean. (Tr. 2-3.) Sessa intends to sell fractional ownership shares to help pay for the conversion, in addition to doing some of the work himself. (Tr. 8.) No sales have occurred to date. (Tr. 35.)

Sessa made arrangements to haul and store the vessel at the plaintiff's yard in December

---

[3] "Tr." references are to the page of the evidentiary hearing conducted on the request for issuance of a preliminary injunction on July 23, 2007.

2004. (Tr. 5.) Sessa acknowledges that he was responsible for renting a crane to pull CLARITY out and place it in the yard. (Tr. 6,7.) According to Sessa, the monthly storage was not discussed prior to any haul out. Sessa testified that the conversion work was estimated to take three years (Tr. 8.) Sessa stated that he relied on a notice posted at the plaintiff's boat yard for annual winter storage - which was $40.00 a foot for a six-month period (or $533.00 a month). (Tr. 16, 58.) Notwithstanding this, the first check paid to the yard for storage was $400.00 (described as a "good faith payment"), and a week later, on January 21, 2005, he paid $1,000.00. Sessa testified that in March the parties negotiated to a monthly rate of $750.00. (Tr. 18, 19.) According to Exhibit 2, prepared by Sessa, he paid two other $500.00 checks in February 2005 and a check for $2,100.00 in June, followed by a check in July for $750.00 and a check in September for $750.00 - for a total of $6,000.00 through September. No other payments have been made to date. Sessa claims he stopped paying the rent because plaintiff, John Gladsky ("Gladsky"), had not retrieved his keel, which sank when the vessel was hauled out. Although defendant paid no storage from September 2005 on, he continued to have access to the boat until Christmas 2005 when the yard closed for the holidays. (Tr. 23.) This action was commenced in the state court in May 2006 and removed to this court in June of that year. Sessa has been denied access to CLARITY since January 2006.

  Sessa's claim of irreparable injury is the delay in the conversion rendering him unable to market the boat. He further maintains that he was denied access to his tools for which he could have employed 60 hours a week for six months at the hourly wage of $60.00. At no time, however, did he request that the plaintiff provide him with his tools. (Tr. 57.) Sessa also claims that the denial of access has resulted in a loss of ten weeks of charter revenue, which he

estimates at $20,000.00 per week or $200,000.00 for a six-month period. (Tr. 41.) He acknowledges, however, that even if access were not interrupted, the vessel would not be completed and ready for launch. (Tr. 40.)[4] Sessa acknowledges that no work had been commenced on the inside structure prior to December 2006 due to his inability to verify the size and metallurgy of the keel, which was not available and had sunk during the haul-out. (Tr. 54.) The keel on the converted vessel was to slide up and down through a sleeve - enabling the keel to be partially retracted in shallow water. (Tr. 54.) Sessa was unable to state that the water in the stern bulkhead, which he attributes to the denial of access, caused any permanent or substantial damage to the vessel. (Tr. 60.)

John Gladsky testified that he quoted the defendant a figure of $25,000.00 to haul CLARITY out of the water with his crane OVUS I, which is berthed in Brooklyn. (Tr. 67-68.) This was rejected by the defendant as too costly and plaintiff was informed by Sessa that he (Sessa) would make his own arrangements to remove the vessel from the water. During hauling, CLARITY sank prior to be lifted from the water, apparently due to the imbalance caused by the removal of the keel. In addition, the keel sank to the bottom in shallow water just off Gladsky's bulkhead. Plaintiff denies any responsibility for hauling the vessel out or for removal and/or the sinking of the keel. (Tr. 70-71.) Once out of the water and the weight reduced by the removal of the keel, plaintiff testified that he assisted with the yard crane in settling the boat level on the cradle. (Tr. 67-69, 80.) Gladsky testified that he also assisted Sessa in putting a 3" nylon line around the keel, which was then attached to the rope from the crane Sessa had hired, in an effort

---

[4] Exhibits 3 and 4 consist of a conversion delay impact schedule chart prepared by plaintiff. (Tr. 31, 32).

to raise it from the mud. (Tr. 80-81.) Gladsky testified that he told defendant to try it while the crane he had hired was there but "don't blame me if it doesn't work." (Tr. 81.) This attempt failed however, which failure Sessa attributes to Gladsky.

According to Gladsky, the agreed storage price was $1,000.00 a month for what plaintiff understood to be a two-year period to complete the conversion and re-launch CLARITY. (Tr. 73.) When defendant only paid $500.00 a month for several months, Gladsky stated that the parties agreed to compromise on the $750.00 per month amount. (Tr. 73.) Plaintiff identified the $1,000.00 payment on January 21, 2005 as payment of the $1,000.00 per month which was one month of storage. (Tr. 83.) Plaintiff said he accepted two checks for $500.00 between February and June as "[b]etter than getting nothing at all." (Tr. 84.)

In late 2006 or early 2007 plaintiff custom made a 200 pound lifting plate which two divers attached to CLARITY'S sunken keel, and plaintiff lifted the CLARITY keel from the water with the yard crane. (Tr. 75.) Plaintiff paid the divers $1,900.00 for affixing the plate. (Tr. 82.) The reason plaintiff retrieved the keel was that it was blocking the waterway for a barge that he wanted to bring in. (Tr. 89.) Without being retrieved, the keel would otherwise have been damaged. (Tr. 89.)

Plaintiff denied that the original agreement included permission for the defendant to bring in a container (Tr. 87). The defendant never brought one in or made arrangements to do so. Notwithstanding the absence of any such agreement, plaintiff states that when Sessa later asked to bring one in, he told Sessa where he could put it. (Tr. 88.) Sessa never followed through, however.

Plaintiff testified that around the Christmas holiday 2005 a sign was posted that the yard

was closed for the holiday. Later, a second sign was posted that there "would be no admittance without insurance coverage." (Tr. 91.) The second sign was posted due to Sessa working at the yard with "large quantities of flammable liquids and resins" and due to the injury of one person on his boat while "transiting his staircase up to the boat." (Tr. 91.)

Discussion

I.  Defendant's Application for a Preliminary Injunction

A preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies" and "should not be routinely granted." Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264, 273 (2d Cir. 1986) (quoting Med. Soc'y of New York v. Toia, 560 F.2d 535, 538 (2d Cir. 1977)). Due to the extreme nature of this relief, the moving party bears the burden of demonstrating the following: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Hanson Trust, 781 F.2d at 273. "[T]he purpose of a preliminary injunction is to maintain the status quo ante pending a full hearing on the merits." Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir. 1985) (citing cases).

A.  Irreparable Harm

"'Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" Bell & Howell v. Masel Supply Co., 719 F.2d 42, 45 (2d Cir. 1983) (quoting 11 C. Wright & A. Miller, Federal Practice and Procedure, § 2948, at 431(1973) and citing cases). Such irreparable harm must be "actual and

imminent" and "not remote or speculative." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979) (citation omitted). Moreover, it is well-established that "irreparable injury means injury for which a monetary award cannot be adequate compensation." Jackson Dairy, 596 F.2d at 72. Accordingly, "where money damages are adequate compensation, a preliminary injunction will not issue since equity should not intervene where there is an adequate remedy at law." Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 918 (2d Cir. 1986) (citation omitted).

Here, defendant asserts four possible categories of loss or injury: (1) the inability to access the vessel is delaying defendant's ability to work on the vessel so as to make it seaworthy and remove it from plaintiff's marina (Duffy Decl., ¶ 41); (2) the delay in working on the vessel is resulting in "financial losses" that are being incurred "not the least of which is lost charter hire revenue in the amount of $20,000.00 per week . . . and/or loss of fractional ownership share sales because the vessel will not be ready to earn income on schedule" (Id., ¶ 42); (3) "concerns of public safety and property damages" due to the fact that Sessa only has a "temporary shelter constructed over the vessel that requires daily inspection and constant maintenance to ensure the integrity of the structure for safety reasons and to prevent damage to [defendant's] property" including to the vessel itself as well as various tools (Id., ¶ 43); and (4) the inability to access the marine yard is preventing defendant from using his tools and equipment that are being stored with the vessel, to mitigate any damages "with alternative work" (Id., ¶ 44.)

By his own statements, defendant has made clear that if it is found that he has been damaged in any way by plaintiff's actions, money damages will adequately compensate him. The various injuries defendant asserts all pertain to financial losses, including "lost charter hire

revenue" and damage to tools or equipment or the vessel itself.[5] Accordingly, since defendant can be more than adequately compensated by money damages, should it be necessary, there is no reason to issue a preliminary injunction on the basis of irreparable harm.[6]

B.  Likelihood of Success on the Merits

A movant seeking to obtain a preliminary injunction on the basis of likelihood of success on the merits "need not show that success is an absolute certainty." Abdul Wali, 754 F.2d at 1025. Rather, the movant "need only make a showing that the probability of his prevailing is better than fifty percent." Id.

Here, defendant asserts causes of action for breach of contract, breach of warranty of workmanlike performance[7] and seeks to add a claim of wrongful eviction.[8] Plaintiff's claims against defendant are for breach of contract and nonpayment of marine services.

---

[5] Sessa acknowledged that in the absence of a survey, there is no way to determine that there is any substantial or permanent water damage.

[6] Although defendant's motion for a preliminary injunction must be denied due to his inability to establish irreparable harm, which is a mandatory element that must be proven for the issuance of injunctive relief, the remaining elements - likelihood of success on the merits and the balancing of equities - will be discussed as well, for the sake of completion.

[7] Defendant's claim for breach of workmanlike performance appears to be based on an allegation that plaintiff failed to salvage the keel of defendant's vessel out of the water. However, it is undisputed that the keel was indeed salvaged on February 24, 2007 and that defendant was informed of this via photograph sent on or about April 11, 2007. (Forsberg Aff., ¶ 8 and Exs 6-8, annexed thereto). It is unclear whether this claim is still alive in the within action. Even if it is, it would appear that the claim is no longer actionable since plaintiff has provided evidence of his performance with respect to this issue and it is unlikely that defendant would succeed on the merits of this claim at trial. Accordingly, only the breach of contract claim requires analysis.

[8] Since wrongful eviction is not currently part of defendant's counter-claims, it will not be discussed in connection with whether there is a likelihood that defendant will succeed on the merits of the action. Rather, it will be discussed in detail later in this memo as part of defendant's motion to amend.

"To state a claim for breach of contract under New York law," a party must prove "(1) the existence of an agreement, (2) adequate performance of the contract by [that party], (3) breach of contract by the [other party], and (4) damages." Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996) (citing Tagare v. NYNEX Network Sys. Co., 921 F. Supp. 1149, 1149 (S.D.N.Y. 1996)).

Here, the parties do not dispute the existence of an oral agreement by which the plaintiff would provide storage space for defendant's vessel at his marina. Regardless of what the original cost was, the parties negotiated, compromised and agreed that the monthly storage would be $750.00. In addition, defendant maintains that plaintiff breached the contract by failing to fulfill certain responsibilities agreed to by the parties. However, defendant provides no evidence of his "adequate performance of the contract," which is a required element of a breach of contract claim. In fact, defendant even acknowledges that he failed to fully perform the contract in that he ceased paying the agreed upon monthly storage fee to plaintiff in September 2005 while still being permitted to store his vessel at plaintiff's marina, and access it at his will, until December 2005. To the extent that Sessa maintains that he was justified in withholding storage payments because Gladsky was to blame for the keel dropping into the mud, the proof in support of this claim is weak, and I credit Gladsky's testimony that Sessa made his own arrangements because use of Gladsky's crane was too costly. Based on the evidence submitted, if anyone breached the contract here, it appears to be defendant and the likelihood of success on the merits actually lies with plaintiff.

Moreover, defendant cannot establish that he is likely to succeed on his breach of contract claim because he cannot prove any damages. The damages that defendant claims are

purely speculative and pertain solely to lost future income, which he bases on "the rates charged by similar vessels" and not on the earning history of his vessel itself. (Duffy Decl., ¶ 42.) Where a pleasure craft, such as defendant's, has no history of income, the owner is not entitled to damages for the loss of its use. See Nordasilla Corp. v. Norfolk Shipbuilding & Drydock Corp., 1982 AMC 99, 104 (E.D. Va. 1981) (finding that the law prohibits damages for "loss of use of a pleasure craft which had no history of income").

The seminal case to address this issue was The Conqueror, 166 U.S. 110 (1897), which involved a dispute over damages for the loss of use of a vessel "designed for pleasure and [which] had] never been put to any other use." Id., at 111. In that case, the Supreme Court stated that damages for "the loss of profits or of the use of a vessel . . . will only be allowed when profits have actually been, or may be reasonably supposed to have been, lost, and the amount of such profits is proven with reasonable certainty." Id., at 125. The Court went on to state as follows:

> [I]n order to entitle a party to be indemnified for what is termed in this court a consequential loss, being for the detention of his vessel, two things are absolutely necessary - actual loss, and reasonable proof of the amount. It does not follow, as a matter of necessity, that anything is due for the detention of a vessel while under repair.

Id. "The decision in The Conqueror remains the law and is cited as such by many circuits." Nordasilla Corp., 1982 AMC at 104 (citing cases).

Based on the foregoing, it appears that, because he cannot establish damages, defendant cannot prove that he is likely to succeed on the merits of his breach of contract claim and is

accordingly not entitled to preliminary injunctive relief on that ground.[9]

    C.    <u>The Balancing of Equities</u>

As stated above, even if a movant fails to demonstrate a likelihood of success on the merits, preliminary injunctive relief may still be granted where there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."[10] <u>Hanson Trust</u>, 781 F.2d at 273. The balance of hardships in the within action does not tip decidedly toward the defendant to warrant the preliminary injunction that he requests.

Defendant argues in his memorandum of law that the plaintiff's "illegal actions" have upset the status quo in this action and that injunctive relief is required to "place the parties in the same position as they were." (Def. Mem. of Law, 6.) However, what defendant is really arguing is that plaintiff's decision to bar him from his marina has now put defendant in the position of no longer being able to access his vessel without paying the required storage fees. Granting defendant a preliminary injunction that would permit him to access his vessel, while still refusing to pay the required monthly storage fees, would not serve to place the parties back in their respective positions or preserve the status quo, but rather would work an injustice to plaintiff by forcing him to continue to allow defendant access to his vessel at plaintiff's yard completely free of charge. If anything, the balance of equities tips decidedly in plaintiff's favor

---

    [9] It should be noted that defendant does not even address the likelihood of his success on the merits of his underlying claims in his attorney's affidavit or memorandum of law in support of his motion for injunctive relief. Rather, he focuses on the balancing of the equities tipping in his favor, as discussed in the next section.

    [10] However, this requires a showing of irreparable harm as well, which, as already discussed, defendant has failed to make.

and warrants a denial of defendant's request.

Based on the foregoing, including the evidence produced at the hearing and on the papers submitted by both sides, defendant has not demonstrated that the balance of equities favors his application for a preliminary injunction. Nor has defendant established either irreparable harm or a likelihood of success on the merits. Accordingly, the defendant's motion for a preliminary injunction is denied.

II.     Defendant's Motion to Amend his Counter-Claim

By this same motion, Defendant seeks to amend his counter-claim to add a cause of action for wrongful eviction.

Federal Rule of Civil Procedure 15(a) provides, in pertinent part:

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Fed. R. Civ. P. 15(a). This rule "reflects two of the most important principles behind the Federal Rules: pleadings are to serve the limited role of providing the opposing party with notice of the claim or defense to be litigated . . . and 'mere technicalities' should not prevent cases from being decided on the merits." Monahan v. N.Y.C. Dep't of Corrections, 214 F.3d 275, 283 (2d Cir. 2000) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962) (internal citations omitted).

It is well settled that "the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330 (1971) (citing Foman, 371 U.S. at 182)). In keeping with this directive, the Second

Circuit has emphasized that "'[a] motion to amend should be denied only for reasons such as undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party.'" Spier v. Ferber, No. 89-1657, 1992 U.S. Dist. LEXIS 13021, at *27 (S.D.N.Y. Sept. 1, 1992) (quoting Richardson Greenshields Sec., Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987)).

"'Futility' is a valid reason for denying a motion to amend . . . only where it is 'beyond doubt that the plaintiff can prove no set of facts in support' of his amended claims." Arena v. Dep't of Soc. Servs., 216 F. Supp. 2d 146, 156 (E.D.N.Y. 2002) (quoting Pangburn v. Culbertson, 200 F.3d 65, 70-71 (2d Cir. 1999) (internal citation omitted). Rule 8(a) of the Federal Rules of Civil Procedure governs the adequacy of pleadings and the proposed amended counter-claim must be measured against that standard. See id.

Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "'The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim . . . [A]ll the Rules require is . . . [that] the claim . . . give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957) (footnote omitted).

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions." Swierkiewicz v. Sorema, 534 U.S. 506, 513 (2002) (setting forth the exceptions for fraud and mistake found in Rule 9(b)). It "establishes a pleading standard without regard to whether a claim will succeed on the merits." Swierkiewicz, 534 U.S. at 515. "Indeed it may

appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Thus, just as the court should not dismiss a complaint for failure to state a claim unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," Hishon v. King and Spalding, 467 U.S. 69, 73 (1984), it should only deny leave to amend under the same circumstances. See Ricciuti, 941 F.2d at 123.

Defendant seeks to add a counter-claim for wrongful eviction based on plaintiff's actions in refusing to allow defendant into his marina for purposes of accessing his vessel. Under New York law, a wrongful eviction, whether actual or constructive, requires "a wrongful act by the landlord, which deprives the tenant of the beneficial enjoyment or actual possession of the demised premises." Barash v. Penn. Terminal Real Estate Corp., 26 N.Y.2d 77, 82 (1970). In addition, "the tenant must have been deprived of something to which he was entitled under or by virtue of the lease." Id. This cause of action is clearly limited to the landlord-tenant context, which is inapplicable in the within case.

Plaintiff and defendant did not enter into a lease by which a landlord-tenant relationship was created. Rather, by defendant's own words, they "entered into an oral agreement whereby [plaintiff] was to haul, store and launch the yacht S/Y CLARITY at the [plaintiff's] Marine yard in exchange for agreement upon payments." (Duffy Decl., ¶ 8.) Defendant was not a tenant but instead a mere licensee. A licensee is defined in Black's Law Dictionary as "[a] person who has a privilege to enter upon land arising from the permission or consent, express or implied, of the possessor of land but who goes on the land for his own purpose rather than for any purpose or interest of the possessor." Black's Law Dictionary 921 (6th ed. 1990). This definition is

"consistent with [that] employed by New York courts." Carter v. Helmsley-Spear, Inc., 861 F. Supp. 303, 334 (S.D.N.Y. 1994) (citing cases). "It has long been the rule in New York that a licensee, as opposed to a tenant or one having a greater interest in the use or particular real property, cannot maintain an action for wrongful ejection." Id. (citing Napier v. Spielman, 111 N.Y.S. 983, 985-86 (App. Div. 1908), aff'd, 196 N.Y. 575 (1909)); P&A Bros., Inc. v. City of New York, 585 N.Y.S.2d 335, 336 (App. Div. 1992) ("The decision by the Court of Appeals in Napier v. Spielman . . . that a servant or licensee acquires no possessory interest in property is still valid authority."). "While it is true that tenants . . . may be evicted only through lawful procedure, others, such as licensees . . . who are covered by [New York Real Property Actions and Proceedings Law ("RPAPL")] 713 are not so protected." Carter, 861 F. Supp. At 334 (quoting "P&A Bros., 585 N.Y.S.2d 336). Although RPAPL 713 does permit a special proceeding as an additional means of effectuating the removal of a nontenant, such as a licensee, it "does not replace an owner's common-law right to oust an interloper without legal process." P&A Bros., 585 N.Y.S.2d at 336.

Moreover, the elements of a wrongful eviction provided by the New York Court of Appeals require that the tenant be deprived of the enjoyment or possession of the *premises*. Although the term premises has many meanings, one of its definitions - and the only one applicable to a wrongful eviction context - is the following: "Land with its appurtenances and structures thereon . . . A dwelling unit and the structure of which it is a part and faculties and appurtenances therein and grounds, areas, and facilities held out for the use of tenants generally or whose use is promised to the tenant." Black's Law Dictionary 1180-81 (6th ed. 1990) (citing Residential Landlord and Tenant Act, 1.301(a)). Defendant did not enter into an agreement to

rent land or a dwelling unit from plaintiff. The contract agreed to by the parties was simply a storage agreement which gave defendant license to enter onto plaintiff's land for the purpose of storing and accessing his vessel.

Based on the foregoing, defendant is a licensee and not a tenant and therefore cannot maintain an action for wrongful eviction under New York law. Accordingly, since there is no set of facts upon which defendant can base a counter-claim for wrongful eviction, it would be futile to permit him to amend his counter-claim.

## Conclusion

Based on the foregoing, the defendant's motion for preliminary injunctive relief to permit him access to his vessel located in plaintiff's marina is denied. In addition, defendant's motion to amend his counter-claim to assert a cause of action for wrongful eviction is denied based on futility.

SO ORDERED:

Dated: Central Islip, New York
September 21, 2007

/s/ E. Thomas Boyle  
E. THOMAS BOYLE  
United States Magistrate Judge